FILED
2011 Jun-10  PM 12:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TWIN PINES COAL COMPANY, INC., and RGGS LAND & MINERALS, LTD, L.P., a Delaware Limited Partnership,** | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CASE NO. 2:09-CV-1403-SLB** |
| v. | ) ) | |
| **COLONIAL PIPELINE COMPANY,** | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is before the court on defendant Colonial Pipeline Company's Motion for Court Determination ("Motion for Court Determination") as to Whether Letter from RGGS Attorney is Privileged.  (Doc. 101.)[1]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Motion for Court Determination is due to be granted.  The court holds and determines, for the reasons set forth below, that (a) RGGS waived the attorney-client privilege that originally attached to the letter by sending the letter to U.S. Steel, a non-party, (b) the common interest doctrine does not apply to communications between RGGS and U.S. Steel, and (c) RGGS waived the letter's work product protection by failing to

---

[1]   Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

make a timely assertion of work product.  However, the letter's admissibility at trial is a separate issue to be examined at the time of trial.

## I. BACKGROUND

On July 14, 2009, plaintiffs Twin Pines Coal Company ("Twin Pines") and RGGS Land & Minerals, Ltd., L.P. ("RGGS") filed suit against defendant Colonial Pipeline Company ("Colonial"), alleging two counts of breach of contract arising out of plaintiffs' coal mining operations at the Segco Mine located in the Dry Creek Reserve in Shelby County, Alabama.  (Doc. 1 ¶ 7, Compl.) Plaintiff RGGS owns the coal and other mineral rights on the Dry Creek Reserve while  United States Steel Corporation ("USSC") owns the rights to the land.  (*Id.*; Doc. 101 at 2.)  In August and November of 2007, Twin Pines entered into mineral and surface leases with USSC and RGGS, which gave Twin Pines the right to remove coal contained in the Dry Creek Reserve and obligated Twin Pines to pay royalties to RGGS and USSC.  (Doc. 1 ¶¶ 8, 22; Doc. 101 at 2.)

Defendant Colonial transports petroleum products through its pipeline, which traverses the Dry Creek Reserve.  (Doc. 1 ¶ 9.)  Colonial's right to own, operate, and maintain the pipeline through the Dry Creek Reserve derives from a 1962 Agreement with USSC ("the Agreement").  (*Id.* ¶ 10 & Ex. A.)  Under the Agreement, Colonial is subject to reservations and retained rights of USSC and its successors and assigns, which include Twin Pines and RGGS.  (*Id.* ¶¶ 11, 12.)  The parties do not dispute that Twin Pines has succeeded to the right to enforce the Agreement.

2

USSC operates a steel manufacturing plant in Fairfield, Alabama. (Doc. 101 at 2.) In January 2009, USSC entered into a coal purchase agreement with Twin Pines for coal mined at the Segco Mine for U.S. Steel's Fairfield plant operations. (*Id.* at 2-3.) In April 2009, USSC instructed Twin Pines to halt coal deliveries under the contract. (*Id.* at 3 [citing Twin Pines' Answers to Colonial's Third Set of Interrogatories, No. 2].) Twin Pines subsequently suspended its mining operations at the Segco Mine and filed this lawsuit against Colonial in July 2009. (*Id.*)

Because Colonial's pipeline was located in the area intended for mining operations, the Agreement provided that USSC would give Colonial reasonable notice of any planned mining operations which could result in damage to Colonial's pipeline, at which time "Colonial shall promptly advise the Steel Corporation whether or not it wishes the Steel Corporation to leave in the ground such coal or other minerals as may be needed to attempt to protect the pipeline from damage and if so, Colonial shall pay the Steel Corporation an amount equal to the value of such coal or other minerals as determined by the Steel Corporation promptly upon notice of an invoice therefore." (Doc. 1 ¶ 12 [quoting Doc. 1, Ex. A, ¶ 8].) Plaintiffs have sued defendant for failure to pay an invoice in the amount of $37,624,657.00 as payment for the value of the coal in the area of Dry Creek Reserve where Twin Pines engaged in mining operations and for defendant's failure to provide setback limits as required by the Agreement, which allegedly caused Twin Pines to incur costs in relocating its mining operations. (*Id.* ¶¶ 22, 24-25.) In its

3

defense, defendant claims that "the relocation [of Twin Pines's mining operations] was due to independent business reasons - among others, U.S. Steel's decision to suspend its coal purchase agreement with Twin Pines." (Doc. 101 at 3.)

The privilege issue raised in defendant's Motion, (doc. 101), concerns a letter dated May 13, 2009 written by counsel for RGGS, James J. Sledge, to Dan Clark and Bill Lawrence, both RGGS employees. (Doc. 102-1.) In the letter, Sledge discusses the ramifications of USSC's decision to halt deliveries to the Fairfield plant and its impact on Twin Pines's legal strategy regarding then ongoing negotiations with Colonial for the value of the coal at issue. (*Id.*)

Sledge's letter was sent via e-mail to Lawrence and Clark on May 13, 2009. (Doc. 101 at 41, Ex. B.) Three hours after the e-mail was sent, Lawrence forwarded the e-mail to Bob Canavera, a USSC employee, with the letter attached. (*Id.*) In the e-mail, Lawrence informs Canavera as to the status of Twin Pines's mining operations as discussed by Sledge in the letter. (Doc. 101 at 41, Ex. B.)

In November 2009, Colonial issued a document subpoena to USSC and notified plaintiffs of the subpoena by service. (Doc. 23, Doc. 23-1.) The subpoena requested, among other things, "[a]ny and all documents reflecting, referring or relating to the possible or actual suspension, cancellation or termination of coal sales and/or coal purchase agreements between United States Steel Corporation and Twin Pines Coal Company, Inc." (Doc. 23-1 at 3.) Neither Twin Pines, RGGS, nor USSC objected to the

4

subpoena when it was served.  USSC made the requested documents available for

inspection, and counsel for Colonial inspected and copied the documents on January 11,

2010.  (Doc. 101 at 6.)  On June 25, 2010, RGGS submitted its privilege log to Colonial,

described as a list of documents "withheld [by RGGS] in the discovery process based on

either the attorney-client privilege or work product doctrine."  (Doc. 101 at 45, Ex. D.)

Sledge's May 13, 2009 letter was not included on the log, and neither was the e-mail from

Lawrence to Canavera.  (*Id.* at 47.)

In July 2010, RGGS requested copies of the documents that had been produced by

USSC in response to Colonial's document subpoena, and Colonial complied on July 28,

2010.  Upon learning that Sledge's May 13, 2009 letter was produced by USSC, RGGS

sent Colonial an Addendum to its privilege log on July 22, 2010.  (Doc. 101 at 49, Ex. E.)

The only two items on the Addendum were the May 13, 2009 correspondence from

Lawrence to Canavera (with Sledge's letter attached) and another e-mail correspondence

from Lawrence to Sledge, Clark, and Canavera from that same date.  (Doc. 101 at 51, Ex.

E; Doc. 101 at 43, Ex. C.)  In the Addendum, RGGS noted the attorney-client privilege as

the basis for withholding the documents.  (*Id.*)  In response to Colonial's request that

RGGS elaborate on the basis of its privilege assertions in the Addendum, (doc. 101, Ex.

N), RGGS wrote Colonial by letter dated August 2, 2010, explaining that its privilege

assertion was based on an alleged common interest between USSC and RGGS (doc. 89 ¶

3; doc. 101 at 53, Ex. F).

Defendant has moved the court to determine whether Sledge's letter, which was produced by USSC in response to Colonial's subpoena, is privileged even though it was given to non-party USSC by RGGS.  (Doc. 101 at 1.)  Defendant claims that the letter is a "critical piece of evidence" in support of its defenses, (*id.* at 4), namely, whether Twin Pines operated the Segco Mine at a profit when it was open and whether Twin Pines could have realized a profit had mining operations continued at the Segco Mine (*id.* at 3).  RGGS does not oppose defendant's use of the e-mails, but does object to defendant's use of Sledge's letter itself.  (Doc. 89 ¶ 1.)

## II. DISCUSSION

RGGS argues that the May 13, 2009 letter from RGGS attorney Sledge is protected by the attorney client privilege, the common interest doctrine, and the work product doctrine.  In support of its claim that no privilege attaches to the letter, defendant puts forth several arguments: (1) the e-mail from Lawrence to Canavera is not protected by the attorney-client privilege, (2) RGGS waived the attorney-client privilege that originally attached to Sledge's letter when Lawrence sent the letter to USSC, (3) the letter is not protected by the common interest doctrine, (4) RGGS waived work product protection by waiting five months to object to the letter's disclosure and by not specifically mentioning work product as the basis for the privilege in the privilege log, (5) and RGGS waived any privilege claim by failing to move to quash Colonial's document subpoena served on USSC.  The court will address each possible basis of protection for the letter.

1. <u>Attorney-Client Privilege</u>

In federal court cases where jurisdiction is based on diversity of citizenship, state privilege law applies. *Price v. Time, Inc.*, 416 F.3d 1327, 1335 (11th Cir. 2005) (citing Fed. R. Evid. 501). The attorney-client privilege is incorporated into Rule 502(b) of the Alabama Rules of Evidence. *Ex parte Nationwide Mut. Ins. Co.*, 990 So. 2d 355, 363 (Ala. 2008). Rule 502(b) outlines the general privilege rule, stating:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or a representative of the client and the client's attorney or a representative of the attorney, or (2) between the attorney and a representative of the attorney, (3) by the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or a representative of an attorney representing another party concerning a matter of common interest, (4) between representatives of the client and between the client and a representative of the client resulting from the specific request of, or at the express direction of, an attorney, or (5) among attorneys and their representatives representing the same client.

Subsection (c) states that the privilege may be claimed only by the client or a legal representative of the client, such as a guardian, trustee, or corporate representative. Ala. R. Evid. 502(c). The person who was the attorney at the time the communication was made may also claim the privilege, but only on behalf of the client. *Id.*

A communication is "confidential" for purposes of the privilege "if [it is] not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those to whom disclosure is reasonably necessary for the transmission of the communication." Ala. R.

7

Evid. 502(a)(5).  "The burden of showing the confidential character of a communication rests on the party objecting to the introduction of the evidence.  This party must establish the relationship of attorney and client as well as other facts demonstrating the claim of privileged information."  *Swain v. Terry*, 454 So. 2d 948, 953 (Ala. 1984) (citation omitted).

The court agrees with RGGS that the e-mail from Lawrence, an RGGS employee, to Canavera, a USSC employee, is not protected by the attorney-client privilege as stated in Rule 502.  The only communications protected by 502(b) are those either sent from an attorney or an attorney's representative or received by an attorney or an attorney's representative.  The only other exception, stated in 502(b)(4), protects communications "between representatives of the client and between the client and a representative of the client resulting from the specific request of, or at the express direction of, an attorney."  Ala. R. Evid. 502(b).  Neither Lawrence nor Canavera are attorneys, and 502(b)(4) does not apply because Canavera, a USSC employee, is not Sledge's client (RGGS) or a representative of the client.  Indeed, RGGS does not object to Colonial's possession or use of the e-mail.  (Doc. 89 ¶ 1.)

In contrast, the letter written by Sledge to Lawrence and Clark, both RGGS employees, clearly falls within the attorney-client privilege, as it is a communication between the client and the client's attorney made for the purpose of rendering legal services.  Ala. R. Evid. 502(b).  However, Colonial argues that Lawrence voluntarily

waived the privilege by e-mailing the letter to a third party.  The attorney-client privilege

"may be waived, either directly or constructively, by the client."  *Swain*, 454 So. 2d at

953-54.  The client waives the privilege if the client "voluntarily discloses or consents to

disclosure of any significant part of the privileged matter."  Ala. R. Evid. 510; *see also*

*Bassett v. Newton*, 658 So. 2d 398, 402 (Ala. 1995) ("Voluntary disclosure bars a

subsequent claim of privilege based on confidentiality.").  Waiver by disclosure does not

apply, however, "if the disclosure itself is privileged."  Ala. R. Evid. 510.

By forwarding the letter to a USSC employee, a non-party and non-client of the

RGGS attorney who wrote the letter, Lawrence indisputably voluntarily disclosed

privileged material.  However, RGGS argues that the attorney-client privilege extends to

communications between RGGS and USSC because USSC shares a common interest in

the litigation against Colonial.  (Doc. 105 at 3.)  RGGS asserts that "U.S. Steel, itself a

royalty owner alongside RGGS in the Dry Creek Reserve, has agreed to be bound by any

judgment rendered in this case. [(Doc. 105-2 at 4, Ex. B.)]  There is no question that,

given their relationship, RGGS and U.S. Steel share a common interest in this litigation,

and the letter is protected by the attorney client privilege."  (Doc. 105 at 2.)   RGGS

further states, "RGGS and U.S. Steel's interests with respect to this lawsuit are identical

insofar as both seek to protect and maximize their recovery of royalties through this

lawsuit."  (*Id.* at 3.)

USSC asserts that the common interest doctrine upholds the letter's privilege protection even though it was sent to a third party.  The common interest doctrine is "an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person."  *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).  Alabama Rule of Evidence 502(b)(3) does provide protection for communications between parties on matters of common interest, but only for communications sent to an attorney or a representative of an attorney of another party.  As previously stated, USSC is not a party to this lawsuit and Canavera is not USSC's attorney nor a representative of USSC's attorney.

When the common interest doctrine is raised in the context of disclosure to a third party who is not also a client of the attorney, courts examine whether the third person is considered to have a common legal interest in the subject matter of the communication.  *See Hope For Families and Community Service, Inc. v. Warren*, 2009 WL 1066525, at *14 (M.D. Ala. Apr. 21, 2009); *Lynch v. Hamrick*, 968 So. 2d 11, 16 (Ala. 2007); *Crenshaw v. Crenshaw*, 646 So. 2d 661, 663 (Ala. 1994); *Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Hatas*, 252 So. 2d 7, 28 (Ala. 1971). "[T]he common interest privilege applies when persons share a common legal interest, not when the primary common interest is a joint business strategy that happens to include a concern about litigation."  *Infinite Energy, Inc. v. Econnergy Energy Co.*, 2008 WL 2856719, at *2 (N.D. Fla. July 23, 2008) (citing *Bank Brussels Lambert v.*

*Credit Lyonnais (Suisse)*, 160 F.R.D. 437 (S.D.N.Y. 1995)). "The interest must, therefore, relate to litigation for this privilege to apply. . ." *Id.*

In *Hatas*, the Alabama Supreme Court affirmed a trial court's holding that a witness did not have to answer questions regarding the substance of his communications with an attorney because the testimony was protected by the attorney-client privilege even though a third party was present. 252 So. 2d at 28. At the trial, Partin, one of the defendants, was questioned about a meeting he had with an attorney, Mr. Beddow, Jr., and a third party, named Miss Kelly. *Id.* at 27. Outside the presence of the jury, Partin had testified that he had gone to see Mr. Beddow, Jr. because the FBI had contacted Miss Kelly to verify that Partin had been in Alabama on a certain date. *Id.* at 25. When the trial court later sustained an objection that Partin did not have to testify about the substance of the meeting due to attorney-client privilege, co-defendant International objected, contending that any privilege between Mr. Beddow, Jr. and Mr. Partin was waived due to Miss Kelly's presence at the meeting. *Id.* at 27. In affirming the trial court, the court stated:

> The rationale behind such cases [holding that a third person may testify as to the substance of a conversation between a lawyer and a client in the third party's presence] is that since a third person is not involved in the relationship between the attorney and his client, the presence of such third party defeats the confidential nature of the conference and thereby the privilege . . . Neither that rationale nor the rule which it supports applies when the third person is also a client as to the subject matter discussed in the conference [o]r has a common interest in the matters discussed. The majority rule applicable where such a relationship existed at the time of the conference is stated thusly in 141 A.L.R. at p. 562:

> '. . .[W]here two or more persons interested in the same subject matter
> are present at a conference with an attorney who represents only one of
> those present, it has been held that matters discussed at such conference
> are confidential as to strangers to the conference and accordingly they
> constitute privileged communications as to such strangers.'

252 So. 2d at 27-28.  The court went on to conclude that the trial court properly held the

substance of the conference between Partin and Beddow, Jr. to be confidential and

privileged as to those not present because "Partin and Miss Kelly were both interested in a

legal sense in the subject matter discussed at the conference with Mr. Beddow, Jr." *Id.* at

28.  The court did not elaborate on the nature of the common interest or the relationship

between Partin and Kelly in the opinion.

   *Crenshaw* and *Lynch* both applied *Hatas* to hold that the attorney-client privilege

extends to third parties present at a conference between the client and the attorney only

when the client and the third party share a "common legal interest."  *Crenshaw*, 646 So.

2d at 663; *Lynch*, 968 So. 2d at 16.  Both cases rejected attempts to cloak statements

made by a client to his attorney under the attorney-client privilege when others besides

the client were present when the statements were made.  *Crenshaw* held that a statement

made by the decedent to his attorney in his hospital room that he intended to devise

certain personal property to his son Fred was not protected by the attorney-client

privilege.  646 So. 2d at 663.  At the time the statement was made, Fred was present,

along with his sister Betty.  Lewis, a third sibling, later sought a declaratory judgment that

the inter vivos gift to his brother was invalid and that the property should be split

12

according to the will, which would entitle Lewis to a share.  *Id.* at 662.  Lewis argued that

his father's statements regarding the gift should be excluded as privileged and that Betty

and Fred's presence did not destroy the privilege because, although they were not clients

of their father's attorney, they had an "interest in the proceedings."  *Id.*  After quoting

*Hatas*, the court rejected Lewis's argument, stating, "We conclude that Betty and Fred did

not have a sufficient common legal interest in the subject matter discussed in the

decedent's hospital room to make the attorney-client privilege applicable.  In fact, the

interests of Betty and Fred could be considered adverse to each other, or to those of the

decedent."  *Id.* at 663.  Accordingly, the court held that the attorney-client privilege held

by the decedent was waived.  *Id.*

Similarly, in *Lynch*, the Alabama Supreme Court again held that the attorney-client

privilege did not apply to communications made between the client and her estate attorney

when the client's daughter, a potential beneficiary, was present.  968 So. 2d at 15. As in

*Crenshaw*, the *Lynch* court held that the daughter "did not have 'a sufficient common

legal interest in the subject matter' of the representation" to uphold the attorney-client

privilege despite the daughter's presence during the conversation.  *Id.* at 16 (quoting

*Crenshaw*, 646 So. 2d at 663).  The court stated, "Juanita's and Hamrick's [Juanita's

daughter's] interests were not sufficiently aligned to preserve the attorney-client privilege

because Hamrick's interests in having her mother transfer the property were adverse to

her mother's interests in retaining it."  *Id.*

13

A more relevant factual scenario was presented in *Hope For Families and Community Service, Inc.*, where the court analyzed whether certain communications between plaintiff's attorneys and Windom, a consultant hired by the plaintiff, were privileged under the common interest doctrine.[2]   2009 WL 1066525, at **13-14. Plaintiff was an LLC formed for the purpose of obtaining a license to operate bingo in Macon County, Alabama.  *Id.* at *1.  Windom, a licensed attorney, formed his own LLC for the purpose of providing lobbying and consulting services, and his LLC was retained by the plaintiff.  *Id.*   The contract between Windom and plaintiff stated that its purpose was to "secure a document signed by the Sheriff of Macon County authorizing Client to operate bingo games in Macon County, Alabama."  *Id.*   In furtherance of the contract, Windom had constant interaction with plaintiff's representatives and was authorized to communicate directly with plaintiff's attorneys.  Plaintiff's LLC president testified that plaintiff did not intend to waive the attorney-client privilege when Windom was a party to communications with plaintiff's counsel and that Windom had "intimate knowledge of efforts taken to secure a bingo license for [plaintiff] Lucky Palace and had information which was relevant to Lucky Palace's reasons for seeking representation."  *Id.* at *2.

In response to a subpoena from one of the defendants, Windom withheld certain documents, claiming they were privileged.  *Id.*  Defendants claimed that the attorney-

---

[2]  *Hope for Families & Community Service, Inc. v. Warren* is a federal question case and therefore applies privilege rules derived from federal common law, which appear to this court to be substantially similar to Alabama law with regard to the common interest doctrine.

client privilege should not apply because Windom and plaintiff had merely a business relationship with the plaintiff and not a "common legal interest." *Id.* at *13.  Plaintiff claimed that Windom and plaintiff had a common legal interest to secure authorization of bingo games from the Sheriff of Macon County, as stated in the contract between Windom and Plaintiff.  *Id.*  The court agreed with plaintiff, finding,

> The identical interests [between Windom and plaintiff Lucky Palace] are revealed by the specific terms of the consulting contract and the nature of the relationship between Mr. Windom and Lucky Palace.  The sole reason for Mr. Windom's representation of Lucky Palace, and as clearly recited in the contract, was to obtain a bingo license in Macon County for Lucky Palace, and the sole purpose for Lucky Palace's formation was to obtain a bingo license in Macon County. These parallel purposes make their interests essentially identical.

*Id.*  The court rejected defendants' claim that plaintiff and Windom merely had a business relationship, stating that a business relationship could be formed "for the purpose of pursuing a common legal interest."  *Id.* at *14.  The court further described the relationship between Windom and plaintiff as that of a joint venture, which "comprised exploring the legal implications and obtaining professional legal advice" with regard to securing a bingo license.  *Id.*  Accordingly, the court found the attorney-client privilege extended to shield communications between plaintiff's attorneys and Windom.  *Id.*

The court finds that RGGS and USSC do not have a sufficient common legal interest for the attorney-client privilege to extend to communications between RGGS and USSC.  The court cannot discern a shared legal objective on the part of USSC and RGGS. The relationship between USSC and RGGS is that they both benefit from royalties of coal

15

mined by Twin Pines, and, as stated by RGGS, "both seek to protect and maximize their recovery of royalties through this lawsuit." (Doc. 105 at 3.)   From the outset, counsel for RGGS has characterized the common interest between RGGS and USSC as a financial one, stating, "U.S. Steel receives royalties from the mining of the Dry Creek Reserve, and therefore has a substantial financial interest in the outcome of this case." (Doc. 101, Ex. F.)

Twin Pines has succeeded to the rights of USSC with respect to the 1962 easement Agreement, which has allowed it to bring this lawsuit on USSC's behalf. (Doc. 105-2 at 2.) Mr. Canavera signed an acknowledgment letter dated January 6, 2010, in which counsel for Twin Pines discusses and confirms Twin Pines's successor rights to the Agreement between USSC and Colonial in relation to the instant lawsuit. The letter states:

> [O]n January 13, 2009, Gary L. Sides, Regional Manager for U.S. Steel Corporation confirmed and acknowledged that Twin Pines succeeded to all U.S. Steel Corporation's ("U.S. Steel") right, title and interest in and to that certain ("contract") for a pipeline easement between U.S. Steel and Colonial Pipeline Company ("Colonial") of July 20, 1962 and any amendments thereto (the "Easement Agreement") and that Twin Pines could enforce **on behalf of U.S. Steel** the Easement Agreement.  U.S. Steel understands that . . .Twin Pines brought an action along with RGGS Land & Minerals, Ltd, LP ("RGGS") to recover the value of the coal sterilized by the pipeline, as provided for in the Easement Agreement.

(Doc. 105-2 at 2.) (emphasis added).  Accordingly, any legal – as opposed to financial – interest USSC has in the outcome of this lawsuit is already being pursued by Twin Pines.

16

RGGS points to USSC's acknowledgment letter as support for finding a common legal interest between RGGS and USSC, pointing out that USSC "agrees to be bound by any judgment in connection therewith [resulting from this lawsuit]."  (Doc. 105-2 at 4.) The court finds this to be insufficient for a common legal interest.  The fact that a party is bound by a judgment in a lawsuit - as were the children in *Crenshaw* and *Lynch* - does not mean they have a common legal interest or have participated in efforts to achieve a particular legal outcome.  *See Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (declining to find that documents withheld by non-party bank were protected by common interest doctrine where, even though the bank would benefit from a judgment in favor of plaintiff, there was no evidence of joint prosecution agreement or a coordinated legal strategy between the bank and plaintiff).

In *Hope For Families and Community Service, Inc.*, Mr. Windom had constant interactions with plaintiff's attorneys, was authorized to speak to plaintiff's attorneys, and had "intimate knowledge" of plaintiff's efforts to secure a bingo license.  2009 WL 1066525, at *2.  Here, in contrast, Mr. Canavera testified that he had not had *any* communications with RGGS's attorneys Sledge or Jane Calamusa, another RGGS attorney, relating to Colonial or this lawsuit.  (Doc. 101 at 71, Ex. I.)  While Twin Pines and RGGS entered into a Joint Prosecution and Confidentiality Agreement after this suit was commenced, USSC was not a party to that agreement.  (Doc. 110 at 27-40, Ex. B.)  In contrast to *Hope for Families*, where the court found a joint venture between the plaintiff

17

and Mr. Windom that was based entirely on "exploring the legal implications" of securing a bingo license, here, USSC is only interested in the legal implications of the lawsuit against Colonial insofar as it affects its ability to recoup royalties.

The court concludes that the common interest doctrine does not apply to communications between USSC and RGGS, and, therefore, the transmission of attorney Sledge's letter to USSC waived the attorney-client privilege with regard to the letter. *See* Ala. R. Evid. 510.

2. Work-Product Doctrine

Even though the attorney-client privilege was waived with regard to the letter, it may still be protected by the work-product doctrine. RGGS did not originally claim that the letter at issue was protected by the work-product doctrine when it added the letter in its Addendum to its privilege log, instead only noting "attorney-client privilege" as the basis for the claimed protection. (Doc. 101 at 49, Ex. E.) RGGS later asserted work-product protection of the letter in its opposition to Colonial's Motion For Leave to File Under Seal, (doc. 89), and in its opposition to RGGS' Motion for Court Determination, (doc. 105).

"The work-product doctrine reflects the strong 'public policy underlying the orderly prosecution and defense of legal claims.'" *United Kingdom v. U.S.*, 238 F.3d 1312, 1321 (11th Cir. 2001) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). The work product doctrine "is distinct from and broader than the attorney-client privilege[ ] . .

18

.; it protects materials prepared by the attorney, whether or not disclosed to the client, and it protects material prepared by agents for the attorney." *Hope for Families & Community Service, Inc.*, 2009 WL 1066525, at *8 (quoting *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979)). The doctrine, embodied in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things," such as memorandums, letters, and e-mails, "prepared in anticipation of litigation or for trial by or for [a] party or its representative." Fed. R. Civ. P. 26(b)(3); *In re Echostar Communications Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1421-22 (11th Cir. 1994). Such documents may only be discovered if they are otherwise discoverable and the demanding party shows that it has substantial need for the materials and cannot, without undue hardship, obtain their substantial equivalent by other means. Fed. R. Civ. P. 26(b)(3).

Rule 26(b)(3) gives a higher form of protection to "opinion work product," that is, the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation. Fed. R. Civ. P. 26(b)(3)(B). Opinion work product includes an attorney's notes of a witness's oral statements, written communications revealing an attorney's litigation strategy, and an attorney's evaluations or legal theories based on a study or survey. *See Cox*, 17 F.3d at 1422; *Callaway v. Papa John's USA, Inc.*, 2010 WL 4024883, at *7 (S.D. Fla. Oct. 12, 2010); *Kallas v. Carnival Corp.*, 2008 WL 2222152, at *7 (S.D. Fla. May 27, 2008). In contrast to factual work

product, opinion work-product "cannot be disclosed simply on a showing of substantial

need and inability to obtain the equivalent without undue hardship." *Upjohn Co. v.*

*United States*, 449 U.S. 383, 401 (1981).  Rather, opinion work product "enjoys almost

absolute immunity" from disclosure, and may be compelled for production only under

extraordinary circumstances, such as in the context of a bad faith lawsuit or the client's

use of a lawyer's services in furtherance of a criminal activity.  *Williamson v. Moore*, 221

F.3d 1177, 1182 (11th Cir. 2000); *Cox*, 17 F.3d at 1422 ("The crime-fraud exception

presents one of the rare and extraordinary circumstances in which opinion work product is

discoverable.");[3] *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th

Cir. 1992) (in bad faith insurance claim case, plaintiff was allowed discovery of

handwritten memoranda prepared by adjuster even though it qualified as opinion work

product).

The court finds that the letter from RGGS's attorney is clearly attorney work-

product prepared in anticipation of litigation.  James Sledge wrote the letter two months

before this lawsuit was filed and it discusses the impact of the loss of USSC's contract on

---

[3] To invoke the crime-fraud exception, the following test must be satisfied:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Cox*, 17 F.3d at 1416.

Twin Pines's mining operations and the potential damages recoverable from Colonial.

Colonial does not argue that it has a substantial need for the materials or that Colonial

cannot obtain the substantial equivalent of the information by other means.  Fed. R. Civ.

P. 26(b)(3)(A).  However, even if Colonial did make that argument, such a showing

would be insufficient to compel disclosure of the materials, since the letter contains

opinion work product.  *Upjohn*, 449 U.S. at 401.  In the letter, Sledge discusses whether

pursuing a certain course of action would be "advantageous" to RGGS and opines on

RGGS's next move, stating, "[W]e need to sit back and wait to see what U.S. Steel does

with Fairfield and what it does with the contracts."  (Doc. 101, Ex. B.)  The court finds

that these statements reveal the "mental impressions, conclusions, opinions, or legal

theories" of RGGS's counsel.  Fed. R. Civ. P. 26(b)(3)(B).

Having established that the letter is attorney work-product, the court must next

decide whether the work-product protection was waived by either RGGS's disclosure of

the letter to a third party or RGGS's failure to make a timely assertion of work-product

protection.  In contrast to the attorney client privilege, "because the work product

privilege looks to the vitality of the adversary system rather than simply seeking to

preserve confidentiality, it is not automatically waived by the disclosure to a third party."

*Hope For Families and Community Service, Inc.*, 2009 WL 1066525, at *9 (quoting *In re

Grand Jury Subpoena*, 220 F.3d 406, 409 (5th Cir. 2000)).      In evaluating whether

disclosure of work product to a third party waives the privilege, courts analyze whether

the disclosure voluntarily increased the opportunities for adversaries to use the information. *See, e.g., Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y. 1989) ("[W]ork production protection is waived when protected materials are disclosed in a manner which substantially increases the opportunity for potential adversaries to obtain the information.") (citation and quotation marks omitted); *Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 47 F.R.D. 334, 338 (S.D.N.Y. 1969) ("The work-product privilege should not be deemed waived unless the disclosure is inconsistent with maintaining secrecy from possible adversaries."). Importantly, "sharing work product material with a friendly party does not waive the work product protection as it applies to an adverse third party." *Niagara Mohawk Power Corp.*, 125 F.R.D. at 587. The court finds that RGGS's disclosure of the letter to friendly third party USSC did not substantially increase the likelihood it would be shared with Colonial and therefore does not destroy its work product protection. *Id.*

Moreover, "courts have been willing to preserve the work product protection over documents in circumstances where the disclosure to a potential adversary was compelled." *Id.* at 587; *Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir. 1978) (holding that defendant's production of work product in prior unrelated lawsuit in response to court order did not waive their work product protection in current suit); *United States v. Bonnell*, 483 F. Supp. 1070, 1078 n.14 (D. Minn. 1979) (stating that work product protection of document would not

22

have been waived if produced in response to an IRS subpoena).  Accordingly, USSC's

production of the letter in response to Colonial's document subpoena did not waive the

letter's work product protection.

Colonial does not directly dispute whether the letter is work-product, instead

arguing that RGGS waived "any work product protection that may have attached to the

Letter" by waiting five months to assert a privilege claim based on work product.  (Doc.

110 at 17.)  In response, RGGS asserts that it timely invoked a claim of privilege by

stating in its August 2, 2010 letter to Colonial that it was not "waiving any privilege" with

regard to the emails added to RGGS's privilege log in its Addendum #1, including the

May 13, 2009 correspondence from James Sledge.  (Doc. 105 at 6; Doc. 101, Ex. F.)

However, in that August 2, 2010 correspondence, counsel for RGGS mentions only the

attorney-client privilege and the common interest doctrine as grounds for protection of the

correspondence, and does not reference the work product doctrine.  (Doc. 101, Ex. F.)

RGGS did not raise the work product doctrine as a basis of protection for Sledge's letter

until it filed its Response to Colonial's Motion for Leave to File Under Seal in February

2011.  (Doc. 89 ¶ 2.)

Rule 26 states that when a party withholds information from discovery by claiming

the information is privileged or work-product, the party must expressly make the claim

and "describe the nature of the documents, communications, or tangible things not

produced or disclosed - - and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). "'A party who fails to file timely objections waives all objections, including those based on privilege or work product.'" *Third Party Verification, Inc. v. Signaturelink, Inc.*, 2007 WL 1288361, at *3 (M.D. Fla. May 2, 2007) (citations omitted) (holding that party who waited almost four months after its discovery responses were due to assert objections based on attorney-client privilege and work-product waived those objections); *see also Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984) ("The applicability of the privilege turns on the adequacy and timeliness of the showing as well as on the nature of the document."); *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 668 (N.D. Fla. 2010) (holding that nonparty recipient of subpoena waived objection to subpoena on basis of proprietary information or trade secret by failing to timely object to subpoena).

A privilege log is one method of expressly claiming attorney-client privilege or work product protection on a document-by-document basis. Where only one basis of privilege is invoked in a privilege log, courts have refused to consider another basis of privilege subsequently asserted by the party. *See MCI Construction, LLC v. Hazen and Sawyer, P.C.*, 213 F.R.D. 268, 272 (M.D.N.C. 2003); *Peacock v. Merrill*, 2008 WL 762103, at *8 (S.D. Ala. Mar. 19, 2008) (ordering defendants to produce documents to

24

plaintiff because the attorney-client privilege was held not to apply and defendants did not

assert another privilege attached to the documents (citing *MCI Construction*)).

In *MCI Construction, LLC*, the court rejected a defendant's assertion of work

product, raised for the first time in a brief in response to the plaintiff's motion to compel,

when the defendant's privilege log had only claimed protection based on the attorney

client privilege and did not mention work product.  213 F.R.D. at 272. The court stated

that "simply making a statement in a brief without any support is both late and

insufficient," and that "[t]he [defendant's] assertions of privilege are controlled by its

privilege log." *Id.*  After finding that the attorney client privilege did not apply to the

withheld documents, the court ordered the production of the documents at issue. *Id.* at

273.

The court finds that RGGS's assertion of work product for the first time in briefs

before the court regarding the privilege issue is likewise too "late and insufficient" to

raise a successful claim of work-product protection. *Id.* at 272.   Although otherwise

applicable, RGGS has waived the work product protection with regard to the May 13,

2009 letter from James Sledge by failing to make a timely claim of work-product

protection to Colonial.  RGGS was aware of the disclosure in July 2010, and for five

months, based its claim of privilege only on the attorney-client privilege, not the work-

product doctrine.  Five months is too long as a matter of law to wait before raising a claim

of privilege.  *See Third Party Verification, Inc.,* 2007 WL 1288361, at *3 (objection to discovery on basis of privilege waived when raised four months after discovery responses were due); *United States v. 58.16 Acres of Land*, 66 F.R.D. 570, 572 (E.D. Ill. 1975) (objections to interrogatories that were filed four months after they were initially filed held untimely and deemed waived).  In sum, because RGGS has waived both the attorney-client and work-product privileges, Colonial is free to use the letter during discovery.  However, the letter's admissibility at trial is a separate issue to be examined at the time of trial.

       **DONE**, this 10th day of June, 2011.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE